CHASE NATIONAL BANK OF THE CITY OF NEW YORK, as Trustee under The Manila Electric Railroad and Lighting Corporation Indenture dated September 24, 1903, as Supplemented by a Supplemental Indenture dated January 1, 1922, Plaintiff, *v.* MANILA ELECTRIC COMPANY et al., Defendants.

Supreme Court, Special Term, New York County, February 19, 1943.

*Arthur A. Gammell* and *Einar B. Paust* for plaintiff.

*Addison S. Pratt* and *Allen E. Throop* for Manila Electric Company, defendant.

*Benjamin A. Matthews* and *Allen E. Throop* for Associated Electric Company, defendant.

*Frederick L. Kane* for Noel T. Dowling et al., as Trustees under Pension Trust Agreement dated December 14, 1937, as amended, defendants.

*James B. Lieberman* for Dover Casualty Insurance Company, defendant.

*L. A. Warren* for Utilities Employees Securities Company, defendant.

*Bernard L. Young, Jr.,* for Lucy C. McGovern et al., defendants.

*Charles F. Wheaton* for Benjamin F. Few, defendant.

SCHREIBER, J. Plaintiff's predecessor, under a certain trust indenture dated September 24, 1903, supplemented by indenture dated January 1, 1922, became trustee for bondholders of cor-

porate predecessors of some of the defendant corporations. Originally $5,000,000 of such bonds were issued, of which $990,000 remain outstanding, $4,010,000 having been acquired by the trustee with funds obtained by reason of sinking-fund provisions. Thereunder the obligor was required from March 1, 1918, to pay to the trustee one per cent of the entire issue, or $50,000 annually, this sum and the interest on the bonds already acquired by the trustee to be applied to the purchase of bonds at the lowest price obtainable but not exceeding 105 and accrued interest. The sinking-fund provisions of the indentures further require that if sufficient such bonds are not available, the trustee is to draw by lot among the outstanding bonds for those to be purchased for the sinking fund at 105.

Presently, the trustee has on hand in the sinking fund the sum of $150,580.82 and also $99,437.45, proceeds of fire insurance. All of the physical assets subject to the lien of the obligation of any value are located at or near Manila in the Philippine Islands.

The complaint alleges that said physical properties subject to the lien of the indentures are now in the hands of the Japanese and that a serious doubt has arisen thereby as to the enforcibility of the lien; that after a period of default, the amounts due under the indentures as of March 2, 1942, were paid, but the payments due September 1, 1942, are unpaid; that the essential purpose of the indentures is that all of the bondholders are to be equally benefited without preference, priority or distinction; that if the sinking-fund plan provided for in the indentures is carried out, and the lien is in fact unenforcible and defaults made in future payments, the result will be to favor the bonds thus repurchased under the sinking-fund plan to the detriment of the remaining outstanding bonds; and that the major purpose of the trust, to protect all bondholders equally, will thus be defeated.

The complaint further alleges that the enemy occupation of the Philippine Islands was unforeseeable and unanticipatable by the parties to the indentures; that under the circumstances alleged plaintiff trustee is entitled to apply to the court for instructions and for permission to deviate from the indentures in this regard; that the bondholders are adequately represented in this action so that all will be bound by any decree of the court; and that the main defendant corporations are the successors of the obligor corporation named in the indentures.

The relief sought is that the court determine whether a deviation with regard to the sinking-fund provisions of the inden-

tures is proper under all the circumstances herein and instruct the trustee in regard thereto; and determine whether the plaintiff's expenses in this action are properly chargeable against the trust.

It is proposed by plaintiff that the sinking-fund cash on hand be distributed *pro rata* among the holders of the outstanding bonds. In this connection, plaintiff submitted the question whether the bonds held by the defendant Associated Electric Company, amounting to $383,000, were entitled to share in the distribution, in view of the position taken by plaintiff that said defendant Associated Electric Company was ultimately liable on the bonds. Plaintiff seeks such other relief as the nature of the case may require and as may be equitable.

The said corporate defendants, after certain formal denials, assert affirmatively that any deviation from the sinking-fund provisions of the indentures will be prejudicial to them in that the purchase of outstanding bonds by the trustee at a discount will thereby be prevented to the detriment of stockholders and creditors of the said corporations. Other defendant bondholders take varying positions, some asking dismissal of the complaint and others joining in the prayer for relief sought by plaintiff.

It should be noted that during the course of the trial plaintiff obtained a license from the Treasury Department of the United States to continue this suit which was necessary because of the executive freezing order on Philippine obligations dated August 12, 1942. [General Ruling No. 10A of United States Treasury Department, issued on Aug. 12, 1942, under Presidential Executive Orders No. 8389 as amd. and No. 8998; 5 Federal Register p. 1400, 6 Federal Register p. 2897, 7 Federal Register pp. 147, 6383.]

It is well settled that ample power resides in a court of equity, to be " exercised with great circumspection ", to permit a necessary deviation from a trust indenture in the face of an emergency unforeseeable and not provided for by the parties to the indenture and which threatens the corpus (1 Restatement, Law of Trusts, § 167; *Moss Tie Co.* v. *Wabash Ry. Co.*, 11 F. Supp. 277; *City of Detroit* v. *Detroit United Ry.*, 226 Mich. 354; *Central R.R. Co.* v. *Central Hanover Bank & Trust Co.*, 29 F. Supp. 826; *Third Avenue Ry. Co.* v. *Central Hanover Bank & Trust Co.*, N. Y. L. J., June 12, 1941, p. 2643, affd. 263 App. Div. 974, affd. 289 N. Y. 762).

In the usual situation, illustrated by the authorities just cited, the deviation sought and permitted has relation only to prevention of " erosion " of the trust corpus and preservation of the

physical, tangible assets of the trust estate, generally by substitution of the corpus. It is asserted by some of the defendants that the power of the court to permit deviation from the trust indenture is limited under the authorities within such physical sphere and that since, at bar, the physical assets in question are beyond the protection of the court, there is no power in the court to grant deviation. The court cannot accept this contention. There is a difference between a denial of power without heed to the hardship calling for its use and a definition of hardship that will limit occasions upon which the power shall be exercised. (*Graf* v. *Hope Bldg. Corp.*, 254 N. Y. 1, 10.) In a proper case any deviation from the provisions of a trust indenture for the protection and promotion of any of the rights of the beneficiaries of the trust is well within the broad and plenary powers of a court of equity (1 Restatement, Law of Trusts, § 167; *Moss Tie Co.* v. *Wabash Ry Co., supra; City of Detroit* v. *Detroit United Ry., supra*). Historically a trust is the very creature of equity. (*Fisher* v. *Fields*, 10 Johns. 495; *Johnson* v. *Fleet*, 14 Wend. 176).

Although a sinking fund providing for retirement of some of the bonds outstanding at varying times and prices is not in itself discriminatory or inconsistent with a trust purpose that all of the bondholders be treated equally (*Equitable Trust Co.* v. *Green Star S. S. Corp.*, 291 F. 650, affd. 297 F. 1008), such a fund does not, in the opinion of the court, become a separate trust fund for that purpose and no other unless priority as to specific bonds or classes of bondholders is established by the indenture (*Equitable Trust Co.* v. *Green Star S. S. Corp., supra; Tucker* v. *Empire Trust Co.*, 242 App. Div. 380) or at least until the fund has already been earmarked or drawn for the benefit of specific bonds or bondholders. (*Truby* v. *M. & T. Trust Co.*, 141 Misc. 507.) In other cases a sinking fund remains a security created for the purposes of and with relation to the entire debt and not to a part of such obligation. (*Tennessee Bond Cases*, 114 U. S. 663; *Brown* v. *Penn. R. R. Co.*, 250 F. 513.)

Notice of this action to and representation therein for the bondholders would seem to have been adequate within approved standards. (*Moss Tie Co.* v. *Wabash Ry. Co., supra.*) The record shows that in addition to the mailing of notice of this action and publication of such notice pursuant to an order of this court, plaintiff made every reasonable *bona fide* attempt to locate and advise all bondholders of the pendency of the action. In such case it is proper to conclude that all bondholders shall be bound by any decree to be made herein. (*United States M. & T. Co.* v. *New York Dock Co.*, 108 Misc. 120.)

The court also finds that the seizure of the Philippine Islands by the Japanese in defiance of the Government of the United States comes well within the definition of an unforeseeable circumstance not anticipated or anticipatable by the parties to the indentures.

The remedy being appropriate, there remains to be considered what relief, if any, a court of equity should grant in the present circumstances.

Plaintiff trustee suggests *pro rata* distribution of the sinking-fund cash on hand to outstanding bondholders excluding Associated Electric Company on the ground that such defendant is ultimately liable for the payment of the bonds. It is urged in opposition that any relief in the premises will be prejudicial to the obligor since the continued operation of the sinking-fund plan will reduce the corporate obligor's ultimate liability. It is clear from the record that the trustee can and has purchased outstanding bonds considerably below 105.

In the opinion of the court, a middle course will be conducive to a just and equitable result. Equity must mold its relief to the exigency.

Under present conditions, it is obviously impossible to ascertain whether the lien eventually will be enforcible against the assets in Manila. Perhaps *pro rata* distribution in one form or another would be just at a time when that security is determined to be absolutely lost. It would not seem equitable to order *pro rata* distribution at the present time and would seem to be unnecessarily unfair to the ultimate obligors, for if the security at Manila is regained renewed operation of the sinking-fund plan might be the just course. Present operation of the sinking-fund plan would be grossly inequitable, for it might mean that some of the bondholders would be paid and others get little or nothing. It follows that until such time the *status quo* should be maintained. This conclusion would seem also to be the moving principle of the executive freezing order on Philippine obligations. In an official release of the Treasury Department of the United States [Press Release No. 36], in evidence, dated August 12, 1942, also the date of the executive freezing order, it is stated in part: "Treasury officials stated that today's action was intended to make it clear that the assets in the United States of Philippine companies were fully frozen so that the interests of all the parties involved could be fully and properly protected. It was pointed out that some of these Philippine companies had assets in the Philippines worth many millions of dollars before the war and only a relatively small amount of

funded indebtedness. The companies do not have assets in the United States at this time to meet maturing obligations and since no one knows or could know, the present condition or value of property in the Philippines, it is, at the present time, impossible to deal fairly with the respective rights of stockholders, bondholders and other creditors. Under today's ruling the situation will be frozen until it is possible to ascertain the facts.''

This determination rests on the broad ground of the equity power of the court. Other grounds, though narrower, sustain it as well. On the facts of this case the sinking-fund cash on hand, together with the physical assets in Manila, constitutes an entire single security for all the bondholders. It is the court's duty to maintain that entire security whole for all the bondholders for the duration of present conditions of war and invasion. The objection made on the part of the corporate obligor should not, in the court's opinion, prevent a fair and just result to the bondholders. A just balancing of all the equities herein requires such protection of the bondholders, particularly since it appears that the payments due the trustee as of September 1, 1942, have not been made. It is unnecessary to determine whether, in view of the executive freezing order of August 12, 1942, such nonpayment is in fact a legal default. Whatever the legal character of such nonpayment, it is enough to weigh the balance of the equities in favor of the bondholders.

In view of the foregoing, it is unnecessary to determine at this time whether the bonds held by the Associated Electric Company are to be differentiated from those held by others or to determine whether or not said corporation is ultimately liable for the obligation. Many other related problems suggest themselves, but need not now be decided. It is enough for present purposes that the *status quo* be maintained.

Any party may apply at the foot of the judgment to be entered herein for further relief or instructions when conditions change or new problems arise.

It is apparent that the trustee was justified in bringing this suit and its expenses herein are a proper charge upon the trust corpus, particularly since the action was commenced well prior to the date of the executive freezing order.

Judgment will be directed in accordance herewith permitting deviation from the trust indentures to the extent indicated and instructing the trustee to proceed accordingly.

Settle, on notice, findings of fact, conclusions of law, and judgment in accordance herewith.